This is our second case of the morning, Home Depot v. Hamer, and all for the appellant, Mr. Mastro. Is that the right pronunciation? Yes, Your Honor. And for the appellee, Mr. Ellis. You may proceed. Thank you very much, Your Honors. Randy Mastro, Gibson, Dunn, and Crusher for appellant, Home Depot. Your Honor, this is a sales tax refund case that proves the old maxim that once the state has your money, it's not going to give it back. This case, Your Honor, very clear under Illinois law. Illinois law not only contemplates, it compels a refund under these circumstances, and for good reason. Because where as here, a retailer has remitted the tax on credit transactions, and the customer then defaults and never pays back the retailer, Illinois law contemplates that the retailer as the taxpayer is entitled to, the statutory language is, the department shall refund. Statutory language is that the retailer is entitled to the refund, and for good reason. Snyderman, the Illinois Supreme Court's landmark decision in this area, counsels us that the reason for that is simple. It would be an unjust enrichment to the state, for the state to hold on to that money. Fact of the matter is that the state uses a pretext here, principal pretext, to hold on to that money. Well, let me ask you this. If I go out to a Home Depot and I buy a hammer, and a hammer costs $20, and I pay $20 plus whatever the sales tax is, and I use your Home Depot credit card, which is what these problems arise from, as soon as I sign that, at the end of the day, they bundle up all the receipts, credit card receipts, and they ship them off somewhere to one of these GE companies. Do I understand that correctly? GE Financial, one of these... Your Honor is correct that Home Depot, like all national retailers, has to use a financing company to help administer its program. And after the passage of, you know, a set number of days, real money comes from GE Financial to Home Depot to basically redeem those credit card receipts, right? You've got cash in your pocket. With a haircut, Your Honor. A haircut that is adjusted by the financing company... All right, and that's... ...so that it always makes a profit. But that's a deal that you made with the GE people, right? A deal that, in essence, had to be made to facilitate credits to our customers, our special customers, only our customers in our store. All right, that's fine. But that's a business decision you made, right? Your Honor, it's the structure of... It's going to be a cash and carry business, but you decided to have your own credit card because that was of some value to you, right? Just like the mom and pop shop gives credit to its customers, okay? And that's a business decision they make. Right. My point is, you take the little credit card receipt, you send it off somewhere to the GE company, whichever one it was, there's four of them or so, and they send you a check saying, okay, we've got your credit card receipts, here's your money. Are we good so far? No. Here's our money and a hair cut off the purse. Hair cut off the top because that's my agreement. That's my voluntarily entered into agreement with you, all right? Thirty days pass, 60 days pass, 90 days pass, and the guy who bought the hammer and signed the credit card slip, you've already got your money. He doesn't pay the GE people, right? Correct, Your Honor. How are you out? Well, Your Honor, I'm out in the following way, and this is why I said it was a pretext. The pretext is that we use servicing companies to administer our programs as we have to. We're not a bank. We need someone who's a bank. Now, Your Honor, I'm going to give you a simple hypothetical that explains why the distinction the state is making is an irrational one. Because they look at each individual transaction, and they admit that if I am the mom and pop shop, and I give credit to a customer directly, and the customer doesn't pay, of course I get the refund. They even admit, Your Honor, that if I'm a Home Depot type, and the structure I have with the credit card company is that if a recourse basis or a buyback basis, that I'm the good where there isn't payment and there's a default, if I have to buy it back at the end, Home Depot, that I'm entitled to the sales tax refund. But, Your Honor, this is functionally exactly the same thing, because these parties structure on a portfolio-wide basis. They're sophisticated parties. There's performance history. They structure in advance that Home Depot compensates the financing company in advance on a portfolio-wide basis, not the individual transaction after the fact. On a portfolio-wide basis, it takes a haircut. It allows the financing company the benefits of charging interest, late fees, and other financial benefits of the relationship with its own special customers. It's turning over its customer base to the financing company. And at the end of the day, the reason we know that it's Home Depot that bears that loss is because, don't take my word for it, it was an undisputed record. The financing company witnesses, Mr. Thorncroft, GE no longer has any skin in the game. They're not doing this anymore for Home Depot. But they swore under oath that, in fact, Home Depot bore the loss, and Home Depot made them more than whole on a portfolio-wide basis, because GE always made a profit and could adjust the rate of the service fee to make sure it always made a profit. Now, here's the hypothetical, Your Honor, that proves my point. I sell widgets. I sell 100 widgets at $10 apiece. I give credit directly to my customers. Three of the 100 don't pay at the end of the day. So I only get $970 back on my widgets. I can clearly get the sales tax back on the 30 the state would agree. Same scenario. I sell the 100 widgets at $10 apiece on credit, but I bring in a financing company to do it. In this arrangement, the financing company gets a buyback from me, has a recourse from me on the ones that default. Three default, $30, buyback on my part, state agrees. I get the refund. What happens in our situation? The same thing. On the front end, we compensate the financing company. We take a haircut. We give them a service fee overall that makes them not only whole, but more than whole. So in the same scenario, the financing company, 100 widgets, $10 apiece, three defaults, $30. I'm still entitled to get the tax, obviously, because it's exactly the same scenario. And there is no dispute in this record about it, because not only the Home Depot witnesses, but the financing companies who are acknowledging we're the ones entitled to the refund. Now, under Illinois law, very clear, okay, very clear. The statute also seems to me what you're describing as the same scenario is a different scenario. I beg to differ, Your Honor, because what is the rational, functional difference between structuring on a portfolio-wide basis in advance to make the financing company whole, so it never ultimately bears the cost of the bad debts, and doing it on a case-by-case basis as they arise? There is no functional difference. The difference is they're paying for a service, not a tax. But, Your Honor, in either scenario, even the recourse or buyback scenario, there is a payment for a service. Financing companies don't work for nothing. But the fact of the matter is that Illinois law contemplates, and this is what Snyderman counsels us, and this has been the law in this state for nearly 50 years. What Snyderman counsels us is that the party that pays the tax is the only party entitled to get the refund. And the reason we have the refund statutory scheme is to prevent unjust enrichment to the state. You don't see the financing company here asking for a refund. They're supporting our application. You see Home Depot here as the party that paid the tax. There are unquestionably bad debts here. No one disputes that there were bad debts that had to be written off. The financing company writes them off. We write off the cost of the program in what we pay the financing company. And at the end of the day, this is the thing that is crystal clear about this case. The one party that is not entitled to keep the tax, and Snyderman makes that crystal clear because it would be unjustly enriched, is the state of Illinois. What do you mean that the GE or the financer is supporting your application? Your Honor, Mr. Thorncroft, GE's witness, gave compelling testimony. You mean a witness testified favorably? Yes, Your Honor. I don't see GE here. I don't know what that means to say they support your application. I mean, Your Honor, that first of all, GE provided us voluntarily witnesses to support our application. And Mr. Thorncroft did that, Your Honor. Doesn't that happen very often in litigation that witnesses from an entity are called to testify? I think it's actually extremely important in this sense, Your Honor. There are other circumstances where perhaps there would be an issue about whether it's the financing company entitled to the refund or Home Depot entitled to the refund. You have no such issue here in Illinois. Under Illinois law, only the party that paid the tax, that's what Snyderman tells us, is entitled to the refund, number one. Number two, you don't have the financing company making any kind of claim. You don't have the financing company providing witnesses voluntarily to tell us, quote, the retailer is paying for those losses as part of the price of the program, that our income exceeded our costs, and that the retailer would be paying for the bad debt losses. That is Mr. Thorncroft at the record on pages 135 through 36. Your Honor, my point is this. As a matter of statutory construction, the Illinois statute could not be clearer. The retailer, quote, is entitled to a bad debt refund on any portion of the price that he does not collect. In the case of a tax paid on an account receivable that becomes a bad debt, again, the tax paid is a tax paid, quote, in error under Illinois law. So long as the receiver... It's to make GE more than whole. The service fee and the other... Let me ask it again. Sure. The service fee of which you speak, contractually entered into with GE, contains as a part of it an anticipatory bad debt to Home Depot. It absolutely anticipates that, Your Honor. Absolutely. The structure of the relationship, including the service fee, anticipates that there will be some bad debts, and no bank is going to take that work on unless it knows it's going to be made whole or more than whole. And, in fact, the undisputed record here is that the bank was, in fact, made more than whole. In fact, under the party's agreement, the bank could adjust the service fee to make sure that it was always made whole. So at the end of the day, the party that ended up bearing the losses because it structured in advance on a portfolio-wide basis anticipated bad debts was Home Depot. That's what Home Depot's witnesses said. That's what GE's witnesses said. And under those circumstances, we submit to the court that not only does the Illinois statute require a refund, not only does Schneiderman require a refund, but under the Uniformity Clause of the Illinois Constitution and the Equal Protection and Due Process Clauses, it would be not only irrational, but for Uniformity Clause purposes, there is no real and substantial difference between our scenario where we structure the relationship on a portfolio-wide basis to ensure that the financing company is always made more than whole and that we're on the hook for the cost of bad debts at the end of the day. That is no different than if we had given the credit directly or if we had done it on a recourse basis with a financing company. The end result is exactly the same. And frankly, there isn't any credible dispute in this record that that is the case. The undisputed testimony from both parties to the transaction, that agreement Your Honor referred to, said the same thing. Home Depot bore the losses at the end of the day. Home Depot made GE more than whole for any bad debt losses. And under those circumstances, Home Depot having paid the tax, Home Depot having borne the loss, the loss having been written off as a bad debt, the state would be unjustly enriched to keep the money. Somebody's entitled to a refund here. The state isn't entitled to keep that money because it's a bad debt. It's a tax paid in error under Illinois law. And under those circumstances, it is, as I said at the beginning, it is mere pretext for the state to use the structure of the relationship between Home Depot and the financing company when the end result is exactly the same. And we submit to Your Honors that under those circumstances, this is a statutory violation. It violates both the letter and the spirit of Illinois law. It is a constitutional violation under Illinois' Uniformity Clause and under the Equal Protection and Due Process Clauses. Most states in this country at this point have either voluntarily paid Home Depot the tax, changed their laws to accomplish that, or in several jurisdictions now, Michigan, Alabama, Maryland, have ruled in our favor. There are a handful of outliers, and they all have a common theme. They have a common theme that while their states provide for sales tax refunds, now that the money is with the state, they're trying to hold on to it in any way they can. The reality is Home Depot paid the state of Illinois hundreds of millions of dollars in sales taxes. It seeks a refund on a very, very minute percentage of those, but they are all documented bad debts. The exact amounts, exactly as recorded by the financing company, turned over to us. We know exactly what those amounts were. It's a clear documentary record of bad debts for which someone, and under Illinois law that's the retailer who paid the tax, is entitled to a refund. It's not just a business deal. It's Illinois' compact with retailers that when you collect and remit the tax to the state, if it's a bad debt, if you get stiffed at the end of the day and there's a bad debt, we give you the money back. All we're asking is that this court enforce the compact. Thank you, Your Honors. Thank you, Counsel. Mr. Ellis? Good morning, Your Honors. May it please the Court, Illinois Assistant Attorney General Carl Elitz for the Department of Revenue and its Director. Your Honor, this is a straightforward statutory interpretation case. Section 6 of the Retailer's Occupation Tax Act says that the party who bears the burden of the tax is the party who is responsible or who is going to take the credit. A person claiming a credit may not claim the credit if they have shifted the burden directly or indirectly to any other party. That's the statutory language. That's exactly what... Why should the state be unjustly enriched? Your Honor, the state's not unjustly enriched in this case. First of all, the tax credit here is a matter of legislative grace. There's been no enrichment to the state because there's been the sale of a good at retail in the state. There's a tax imposed on that. The General Assembly has decided that certain vendors will get credit when their customers don't pay the credit transaction that they've entered into. But that's a matter of legislative grace. There's no unjust enrichment in the state not giving a credit for a vendor who decides to sell something on credit and then can't collect. If that were the case, then the state would expose itself to the possibility that, you know, as the economy drops and people don't pay their debts, the sales tax wouldn't be collected and it would make a bad situation worse. They're correct that they paid the sales tax to the state. They remitted it to the state. But on the very day they made the sales, they received a transaction with GE where GE reimbursed them for that tax. Most of the transactions in this case were reimbursed at 100%. Now, there are some transactions that were reimbursed at a less level. The witness testified that when there was reimbursement, it was typically south of 3%. So 97% of every transaction was fully reimbursed. They paid a service fee on some of those transactions. That service fee is a service fee. It's not the tax. It's not a waiver of the tax. We know that the tax was borne by GE because GE took the bad debt expense on its federal income tax. Please note, GE did not take 97% or 98% or 99.9% of the bad debt expense. It took 100% of the expense. Of course, GE supports Home Depot in this case. They've written all of it off. They want to now allow Home Depot to write off something else. So everybody wins except the state. The unjust enrichment in this case then would be against the state, not in favor of the state, if Home Depot were to prevail in this case. The administrative regulation in this case, Section 130.1960D, requires, as I just suggested, that the party claiming the credit be also the party that took the bad debt expense on its federal income tax. That makes a lot of sense because then the department knows that there is a bad debt. We know who bore the bad debt. It's been shifted, as the evidence suggests, by the income tax records here. The department's interpretation of its regulation is a fair one. In the reply brief, my opponent's reply brief, on page 21, they quote the regulation, but they misquote the regulation essentially. They say that a party has to, that the regulation is designed to indicate the trigger. I said page 21 of the reply brief. That can't be right. Page 11 of the reply brief, rather. They quote the regulation. And if you're honest, we'll look at page 11. They italicize the word a before they have the quote, before the break. It says, the regulation requires only that the receipt be written off on a federal income tax return or amended return. That's how they quote our regulation. But our regulation doesn't say a federal income tax return. Our regulation says, the federal income tax return. Now, the regulation is in the passive voice, so obviously there's some possible disagreement for interpretation. But the fact that the regulation uses the word, the, indicates that we have a particular taxpayer in mind. And obviously it's not the credit card financing company who is involved in the transaction, because most of these regulations don't apply to credit card financing transactions. We're thinking about the vendors who are paying this tax. It's the party who pays the tax, is the party who is also the party that takes the bad debt expense on its transactions and its federal income tax return. That's the party that's borne the burden of the tax. And you don't have to take my word for it. The appellate court has decided in a case, Central Furniture, that when the parties enter into these type of agreements and shift the burden from the vendor to the finance company, even when, as in the Central Furniture case, they make arrangements for bad debt, unless the bad debt is taken on the taxpayer's return, the court said that's evidence that the debt has been shifted, if it's not on the taxpayer's return. That's the same principle that underlies the department's regulation. So the appellate court in Illinois has gotten to this issue and has resolved it already in favor of the department's position. Also, this is not a case about imposing taxes. This is a case about credit. Tax credits are construed most strongly against taxpayers, not in their favor. So if there's any ambiguity here, it should go in the department's favor, not the taxpayer's. That's the first half of my argument. The second half also is a statutory argument. And that's Section 6A of the statute, which provides that claims for refunds must be presented to the department in a certain way. This is statutory requirements, not regulation. And the requirements are that the department receive monthly records of the transactions, when they occur, not months, years later, when they've gone bad. Home Depot gave none of this information to the department when they submitted their request for refunds. So the trial court and the department correctly ruled that the failure to comply with the statutory requirements of Section 6A prevent Home Depot from getting its credit here. There's some problems also with the way they calculated. They didn't do it, so that should end the matter statutorily. But they come back and they say, well, we've estimated it, and you should take our estimate to be almost as good. But their estimates weren't almost as good. They were far from being as good. They acknowledged that many of the sales at Home Depot, I think 7 or 8 percent, are not taxed at all, or were not taxed at all at the time of the transactions. How did they account for this? They brought in an accountant who backed out the information from the numbers. He didn't offer any foundation for how he did this. He said that this was just a calculation they had to make so that they could make sure that the numbers the department needed were square with the estimates that they provided. That doesn't meet the statute. That's not what the statute requires. The department needs information month to month, and we need to know specifically in what Home Depot stores these sales took place. Because as I set out in the brief, the department needs to refund, or actually not refund, but charge back the credit that would be given to Home Depot to the local taxing bodies. And to do that, we need to know where these sales took place. Their expert witness used an amalgam of information about Illinois and the different counties, but there's no indication that he used the counties where Home Depot has its stores. If Home Depot stores tend to cluster around high tax areas like Cook County, then those numbers don't make any sense because then all the calculations assume statewide rates, but Home Depot sales are not statewide. They also used a blended rate to estimate the tax, and that sort of goes to what I'm talking about because in different counties we have different tax rates. So the department's forms, which I've attached to my brief, require Home Depot to identify the store where the sales took place. They can't do that. They don't even know where the sales took place because they don't care where the sales took place. They turned everything over to GE to handle this transaction and didn't keep the records necessary to be able to back out the transaction. That's why they brought in their experts. That's why they used a lot of estimates instead of providing the department the actual information. And I want to emphasize again, this is statutory required information that's needed for us to process the credits. With regard to fairness, and I touched on this a little earlier, the argument makes no sense. These are not busted sales. These are sales. When there's sales, there's tax. When taxes are due, they have to be paid for two different reasons. One is that they're a vendor in Illinois and they're subject to the Rota tax, but also they're collecting use tax. These goods are in the stream of commerce. They're being used in Illinois. The department has never received taxes for them if they don't remit this tax. The equal protection uniformity arguments are also without merit. The argument is that they try to set up an argument that if they had held onto this debt themselves and administered it, then we would allow them the credit. That's true. In that case, they would be bearing the risk of the loss on the tax and the law would provide for it. But here they've brought a bank in and the bank is making its money by revolving this credit over and over and over again. That's not something a vendor usually wants to do. A vendor's in the business of selling things, not running its shop on making interest. That's the difference. When you take the sales situation and you bring in a bank and you let them revolve credit over and over and over again, there's a fundamental difference between what the vendor who doesn't use that system is doing and the vendor who does. And that system is sufficiently different circumstance to allow the state to avoid equal protection, due process, and uniformity claims that Home Depot makes here. So there should be no doubt about that as well. If your honors decide under Section 6A that they've not permitted enough information to the department to allow the credit, then I don't think you need to get to the constitutional questions. But if you do, I briefed that as well in my brief and there's a few papers there. So unless there are any questions, your honors. Thank you very much. Your honors, I'll be very brief. My worthy adversary described this as a, quote, matter of legislative grace. Actually, it's a matter of legislative mandate. He referred to the particular language of the administrative code and said that somehow supported his position. Let me just quote it briefly to you because it unequivocally supports our position. First of all, a retailer is, quote, entitled to a bad debt credit with respect to the original sale in which the default has occurred to the extent he has paid the tax on a portion of a price he does not collect, end quote. Then, going on to say, in the case of tax paid on an account receivable that becomes a bad debt, the tax paid becomes a tax paid in error for which a claim of credit may be filed on the date that the federal income tax return or amended return at which the receivable is written off is filed, end quote. Absolutely correct. There was a bad debt, and a bad debt written off by the financing company. The financing company also had to recognize the income, the very substantial income it received. So it's both recognizing its income and its bad debt. The net effect for the financing company is that it owes tax because it made a profit. On our tax return, we had a loss. We had a business expense and a loss. And the fact of the matter is that the undisputed testimony, and I did not hear him say one word to the contrary, the undisputed testimony in this case from both sides of the transaction was that at the end of the day, Home Depot bore the loss because it compensated the financing companies in advance and made them more than whole for any bad debt loss they suffered. Therefore, the statutory scheme, by its plain, unambiguous language, the Illinois legislature in its infinite wisdom didn't say the bad debt had to be written off by the retailer. It, in fact, seems to have contemplated that there are going to be circumstances where national retailers who aren't banks have to work with financing companies. And I didn't hear my worthy adversary say that there's anything that precludes the retailer from getting a refund when he does a recourse arrangement with the financing company. Yet that is a contractual relationship where he is in a situation where the retailer is getting paid on a regular basis by the financing company. In fact, under Illinois law, there'd be no question that the retailer would be entitled to the rebate under those circumstances. The fact of the matter is that my worthy adversary describes this as a bad debt expense where GE took 100% of the expense and all of the income. Fact of the matter is that the reality of the transaction on a portfolio-wide basis, as all the parties of the transaction testified, it was Home Depot that, at the end of the day, bore those losses. It paid the tax. It's entitled to the refund on that basis. And, Your Honors, the central furniture case that my worthy adversary cites, I know he knows better than to have cited that case to you as binding precedent because that's the situation where the retailer actually sold credit accounts. Of course that's a different situation. Our situation is an ongoing relationship between retail and financing company where the financing company there is simply to facilitate Home Depot's special customers having credit in its own store only. And, Your Honors, we submit to you that in this situation... Let's say instead of a hammer, somebody comes in a contractor and spends $100,000 in construction materials and defaults. And it uses your financing mechanism with the Home Depot card. Who sues the purchaser? Again, under those circumstances, in the contractual relationship that exists, it would be the financing company that would be in a position to sue the purchaser. But for this simple reason, the financing company is the one that is assuming the obligation to administer the program and chase down... In effect, they bought your paper. They did not, Your Honor. In reality, they continue to have an ongoing relationship with us where they can continue to adjust the price so they always make a profit. They are a service provider. They did not in any way, shape, or form do what Your Honor is suggesting. In reality, as both parties of the transaction acknowledge... Well, if they're just a service provider, what standing do they have to bring suit against your customer? Your Honor, because the credit card itself is a Home Depot credit card to be administered and to be implemented by the credit card company, so it is given the right to go out and chase down bad debts. At the end of the day, these parties, sophisticated parties, know that a certain percentage of those bad debts will never be collected. And at the end of the day, it is that amount that is a bad debt. And at the end of the day, given what Home Depot has paid the credit card company to make the credit card company more than whole for those bad debts, it is by both parties' admission, Home Depot that actually bore the bad debts. But this is the key point, Your Honor. The key point is that under Illinois law, only... And this is why Snyderman is controlling, not the case that my worthy adversary referred to. At the end of the day, only... Snyderman counsels us that only the party that paid the tax is entitled to a refund. And what we have to make sure under Illinois law is that that mechanism exists so there will not be unjust enrichment to the state. Home Depot, contrary to what my adversary said, is not being unjustly enriched in any way. It paid. It structured a transaction to pay in advance a financing company so that it would be the party bearing the bad debt losses. Now I heard here, there's no question there were bad debt losses. I heard here the excuse, the last of many, that Oh, Home Depot didn't give enough particular information to qualify for the refund. The state actually never took that position. That was one that the ALJ came up with. The state actually never even argued that below. And that's for good reason, because Home Depot turned over chapter and verse of thousands of transactions, exactly the dates, exactly the amounts, that came from the financing company. These are the bad debts we can never collect. So we know exactly what the amounts were, and we can figure out exactly what the taxes are. The quibbles that the state now has, seizing on the creative theory of the ALJ as an alternative ground, are ones that go to how much of a refund Home Depot is entitled to. Not the specificity and quantum of information. It's in our record. It's chapter and verse of every bad debt. Exactly the dollars, and exactly what the bad debts were, and exactly who they're from. I submit to your honors that at the end of the day, this case is a classic Snyderman situation. It is exactly what the Supreme Court of this state and the legislature saw as a situation where the state isn't entitled to hold on to the money. It's an unjust enrichment of the state. He said, oh, a sale happened. Actually, under Illinois law, when there is no purchase, purchase meaning consideration and money changing hands. That's the words in the statute. When there's no purchase, there's no sale. That's the fundamental point. When you have a transaction on credit and the customer defaults, and the retailer has as trustee to the state, remitted the tax on a compact that the tax is going to give a refund when the retailer ends up getting stiffed at the end of the day, which is what happened here. There was a stiffing. Make no doubt about it. There's no sale. When you and I do a sale, Your Honor, you're giving me money for something. When I just give you a good and you don't pay me for it, some people call that stealing. But we just call it a bad debt. And under Illinois law, that's a classic case where the state can't hold on to that money anymore. And it would be unjust enrichment for the state to do it. That's what Snyderman teaches us. And it teaches us that the party that paid the tax is the one who gets it back. That's us. Thank you.